IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION


TAMMY RENEE GATES                                              PLAINTIFF


v.                    NO. 3:20-cv-00269 PSH


KILOLO KIJAKAZI, Acting Commissioner                           DEFENDANT
of the Social Security Administration


MEMORANDUM OPINION AND ORDER

Plaintiff Tammy Renee Gates ("Gates") challenges the denial of her application for disability insurance benefits and does so on two grounds. Gates maintains that good reasons were not given for discounting her treating physician's medical opinions and the Administrative Law Judge ("ALJ") failed to resolve an apparent conflict between the testimony of a vocational expert ("VE") and the Dictionary of Occupational Titles ("DOT"). Because substantial evidence on the record as a whole supports the ALJ's decision, and he committed no legal error, this case is dismissed.[1]

---

[1]   The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019).

The record reflects that Gates was born on December 25, 1965, and was fifty years old on June 4, 2016, the alleged onset date. In her application for disability insurance benefits, she alleged that she became disabled as a result of, inter alia, pain in her neck, back, and left arm.

Gates represents, and the Court accepts, that Dr. Charles Davidson, M.D., ("Davidson") has been Gates' "primary care physician since 2012." See Docket Entry 16 at CM/ECF 29. Between July 8, 2015, and the alleged onset date, Gates saw Davidson on multiple occasions for complaints that included neck pain, back pain, and left upper extremity paresthesia and weakness.[2] The treatment notes from the presentations reflect that Gates had tenderness in her neck and a painful range of motion in her neck, back, and left shoulder. Her pain was aggravated by movement, and she had difficulty lifting. She was prescribed medication for her pain that included gabapentin, Flexeril, and Vicoprofen.

---

[2] See Transcript at 551-553 (07/08/2015), 548-549 (08/05/2015), 546-547 (08/26/2015), 544-545 (09/30/2015), 541-543 (10/19/2015), 539-540 (11/19/2015), 537-538 (12/18/2015), 535-536 (01/18/2016), 532-534 (02/17/2016), 530-531 (03/16/2016), 528-529 (04/15/2016), 525-527 (05/13/2016). The recitals of dates in this Memorandum Opinion and Order are not intended to be complete catalogs of every presentation Gates made for her impairments or every test she underwent. The Court also notes that the presentations from before the alleged onset date, as well as testing and medical opinions from that period, were a part of the record in Gates' earlier unsuccessful application. See Gates v. Berryhill, No. 3:16-cv-00333-JJV, 2017 WL 1416859 (E.D.Ark. 2017), aff'd sub nom. Gates v. Commissioner, Social Security Administration, 721 Fed.Appx. 575 (8th Cir. 2018). That evidence is noted at this juncture in order to place her medical condition in an historical context.

On October 23, 2015, or before the alleged onset date, Gates underwent a cervical spine MRI. See Transcript at 554-555. The results revealed, inter alia, moderate chronic left foraminal stenosis at C5-6.

On January 21, 2016, or before the alleged onset date, Davidson signed a To Whom It May Concern letter in which he addressed Gates' limitations. In the letter, Davidson represented the following:

> In brief, this patient has been followed in our clinic for several years. She was seen on September 23, 2013 with severe neck, upper back pain and pain radiating down the left arm. She was working until that point, but not since. She continued to have severe pain as described above and MRI was ordered. The MRI revealed a C6-C7 disk herniation that was impinging the C7 nerve root and a disk bulge at C5-C6. She was referred to Dr. John Campbell, neurosurgeon, for evaluation of her left C7 radiculopathy. On 12-19-2013 she underwent a anterior diskectomy, decompression and arthrodesis with placement of a plate. Mrs. Gates also has a history of vaginal mesh placement. This placement led to erosion of the vaginal mesh and she has had 2 surgeries to remove the vaginal mesh from the vagina and continues to have occasional problems with this. Her last surgery was on May 5, 2015. She had a previous surgery in 2011.
>
> Since September 23, 2013, the date of the onset of her neck pain and left arm pain, this patient has had ongoing problems. She has had persistent pain in this area and down the left arm. She has been evaluated by neurosurgeon Dr. Campbell, and she has seen pain management. She continues to require daily medications and muscle relaxers. She has significant pain and limitations of the use of her upper extremities because of this pain.

> As far as her functional capacities, this patient is limited to any type of continuous standing or walking. In my opinion, she would be able to walk less than 2 hours in an 8 hour work day. On multiple examinations in our office, she is noted to be unable to sit at any one position and she is constantly changing positions and repositioning. In my opinion she would be able to sit and do any type of office work requiring use of her upper extremities for less than 4 hours total in an 8 hour working day and even with that she would require frequent and numerous breaks and changing position. Any use of her upper extremities increases her neck pain. She requires frequent breaks when she is engaged in any type of activity sitting and using her upper extremities. This is made worse by the fact that her left hand and upper extremity is her dominate extremity. This patient is unable to do any type of activities involving reaching or overhead work of her extremities.
>
> In my opinion because of her significant inability to perform any type of sustained work either sitting or standing, I don't feel she is suitable to be a candidate for any type of permanent employment.
>
> Finally, I have known this patient for several years. She has been in my clinic consistently since September 2013. Her complaints have remained very constant and our observations in the clinic have remained very consistent. Unfortunately for her I do not feel that she will be able to return to her prior job as secretary for the Sheriff's office or any other type of gainful employment in the future due to her current disabilities. I do not expect any improvement in her conditions and believe she has received appropriate treatments including surgery, physical therapy, pain management and medications.

<u>See</u> Transcript at 620-621.

On April 18, 2016, or before the alleged onset date, Davidson signed a second To Whom It May Concern letter in which he again addressed Gates' limitations. In the letter, Davidson represented the following:

> This letter is written as a followup for Tammy Gates. Since my letter of January 21, 2016, this patient's condition has not changed. She has shown no improvement in her functional capacities or pain. Please refer to that letter for the specific details. ...

See Transcript at 619.

Gates continued to see Davidson after the alleged onset date for complaints that included neck pain, back pain, and left upper extremity paresthesia and weakness.[3] The treatment notes from the presentations reflect that Gates continued to have tenderness in her neck and a painful range of motion in her neck, back, and left shoulder. Her pain was aggravated by movement that included such activities as standing and

---

[3] See Transcript at 523-524 (06/13/2016), 520-522 (07/11/2016), 517-519 (08/11/2016), 514-516 (09/12/2016), 511-513 (10/12/2016), 508-510 (11/11/2016), 505-507 (12/12/2016), 499-501 (02/10/2017), 491-494 (04/10/2017), 488-490 (05/10/2017), 485-487 (06/09/2017), 479-481 (08/07/2017), 475-478 (09/07/2017), 472-474 (10/05/2017), 469-471 (11/06/2017), 466-467 (11/20/2017), 463-465 (12/04/2017), 459-462 (01/05/2018), 455-458 (02/05/2018), 452-454 (03/05/2018), 448-451 (04/05/2018), 586-588 (06/05/2018), 583-585 (07/05/2018), 580-582 (08/03/2018), 577-579 (09/04/2018), 574-576 (09/26/2018), 570-573 (11/02/2018), 615-617 (12/03/2018), 612-614 (01/02/2019), 610-611 (01/15/2019), 607-609 (02/01/2019), 642-644 (03/01/2019), 639-641 (04/01/2019), 633-635 (05/01/2019), 630-632 (05/31/2019), 626-629 (07/01/2019), 623-625 (07/31/2019).

walking. She reported occasional muscle spasms, pain with range of motion in her hip, and vaginal discomfort apparently related to vaginal mesh surgeries. She also reported reduced grip strength in both hands. She wore a back brace at times, which helped control her pain during activity. She continued to be prescribed medication that included gabapentin, Flexeril, Vicoprofen, baclofen, and Robaxin.

On May 23, 2018, or after the alleged onset date, Davidson completed a Medical Source Statement-Physical on Gates' behalf. See Transcript at 558-559. Davidson noted that the checklist form was "answered by patient per her subjective report." See Transcript at 558. He attested, though, that her limitations were not based solely upon her self-reports but were supported by his "clinical observations, medical judgment, [and] tests and procedures ..." See Transcript at 559. The form reflects, inter alia, that in an eight hour day, Davidson believed Gates can lift and carry less than ten pounds; can stand, walk, and sit for less than two hours; is unable to reach, finger, or handle; and requires frequent bathroom breaks, frequent rest periods, and longer than normal breaks. He represented that the limitations are supported by her "[h]erniated disc on MRI (C6-C7), left arm weakness, pain observed with neck and left arm movement, [and] mesh erosion noted on vagina exam." See Transcript at 559.

On November 6, 2018, or after the alleged onset date, Gates' medical records were reviewed by Dr. Kristin Jarrard, M.D., ("Jarrard"). See Transcript at 92-95. Jarrard opined that Gates is capable of performing at least light work with occasional overhead reaching. Dr. Janet Cathey, M.D., ("Cathey") also reviewed Gates' medical records and offered an identical opinion, i.e., Gates is capable of performing at least light work with occasional overhead reaching. See Transcript at 112-115.

The record contains a summary of Gates' work history. See Transcript at 195-212. The summary reflects that she has a good work history, particularly between 2004 and 2013. She appears to have stopped working after 2013.

Gates testified during the administrative hearing. See Transcript at 39-58. When asked why she stopped working, she testified as follows:

> Well, I had a health problems anyway. I had a lot of problems down here where I can't stand. But the reason why, the last one I finally just had to stop was when; I work up with a blown; I woke up in the middle of the night with a, a disc were blown in my neck and several were bulging and they put a plate in my neck. Well once they did that, it's just; I don't have a lot of turn with my neck. I have to be very careful. It will shock, it's like a shock comes through my neck if I'm not real careful with; and it's, it's affected my left arm. This arm will get real weak. I drop things all the time. It's very embarrassing.

See Transcript at 41. Gates experiences a constant, tight, very tense neck pain that causes headaches. The pain in her left arm and hand prevents her from attending to some of her personal care. She has muscle spasms in her neck, back, arms, and feet. She can shop for groceries but can do so only on a limited basis. She has had repeated surgeries on her vaginal area, and she continues to experience vaginal pain and incontinence. Gates rarely leaves her home and has no hobbies. She can prepare simple meals and perform some household chores.

A VE also testified during the administrative hearing. See Transcript at 58-61. He was asked a question about a hypothetical individual with Gates' limitations, limitations that included, inter alia, an inability to "engage in frequent overhead reaching." See Transcript at 59. The VE testified that the individual could not return to any of Gates' past work, but the individual could work as a police aide or as an administrative clerk, jobs that require frequent reaching. See DICOT 243.362-014, 1991 WL 672264 (police aide); DICOT 219.362-010, 1991 WL 671953 (administrative clerk). The VE then added the following:

> ... I should mention about the DOT conflict with the overhead reaching. DOT does not classify jobs in this way and then considering these, I've had to fall back on my past experience and training, and having experience with these and similar jobs.

8

> Q. With that qualification and the description of the jobs you've given me consistent with the description that appears in the DOT.
>
> A. Yes, sir.

See Transcript at 60.

The ALJ assessed Gates' residual functional capacity and found that Gates is capable of performing light work with additional limitations that include the following: "she cannot engage in frequent overhead reaching." See Transcript at 21. As a part of so finding, the ALJ discounted Davidson's medical opinions because they were offered prior to the alleged onset date, were based upon Gates' subjective reports, and were not well supported by Davidson's own treatment notes. The ALJ credited Jarrard and Cathey's medical opinions because the opinions were consistent with the record as a whole. The ALJ relied upon the VE's testimony and found at step five of the sequential evaluation process that an individual with Gates' limitations could work as a police aid or as an administrative clerk. The ALJ found the VE's testimony consistent with the DOT. In so finding, the ALJ noted the following: "[t]he [VE] testified that directional overhead reaching is not addressed in the DOT, but this is based on the expert's experience and training." See Transcript at 28.

Gates maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole because Gates' residual functional capacity was erroneously assessed. Specifically, Gates maintains that good reasons were not given for discounting Davidson's medical opinions. Although she concedes that his opinions contained in his January 21, 2016, To Whom It May Concern letter were considered in her earlier unsuccessful application, she maintains that the opinions are relevant here because they concern a progressive disease or degenerative condition. Gates also maintains that while Davidson may have relied on her subjective reports in completing his May 23, 2018, Medical Source Statement-Physical, the limitations he identified were based on his "own medical judgment." See Docket Entry 16 at CM/ECF 33. Additionally, Gates maintains that Davidson's notes do not show Gates' treatment was routine and conservative and, even if the treatment were routine and conservative, it was ineffective in controlling her pain.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). As a part of making the assessment, the ALJ is required to consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007).

The regulations governing the consideration of medical opinions were revised for claims filed on or after March 27, 2017.[4] The revised regulations eliminated the long-standing "treating physician" rule and now provide the following:

> ... Under the new regulatory scheme, the Commissioner "will not defer or give any specific weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. 20 C.F.R. 404.1520c(a). Instead, ALJs will determine the persuasiveness of each medical source or prior administrative medical findings based on supportability; consistency; relationship with the claimant; specialization; and any other factor that tends to support or contradict a medical opinion. 20 C.F.R. 404.1520c(a), (c). ALJs are required to "explain" their decisions as to the two most important factors—supportability and consistency. 20 C.F.R. 404.1520c(b)(2). The "more relevant the objective medical evidence and supporting explanations presented" and the "more consistent" a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be. 20 C.F.R. 404.1520c(c)(1)-(2).
>
> The new articulation requirements are meant to "provide individuals with a better understanding of [the Commissioner's] determinations and decisions" and "provide sufficient rationale for a reviewing adjudicator or court." ...

See Phillips v. Saul, No. 1:19-cv-00034-BD, 2020 WL 3451519, 2 (E.D.Ark. 2020).

---

[4]  Gates' application for disability insurance benefits was filed in April of 2018 and is therefore governed by the revised regulations.

Having reviewed the record, the Court finds that the ALJ did not err in evaluating Davidson's medical opinions. The ALJ adequately considered the supportability and consistency of Davidson's opinions, and the ALJ's consideration of those factors is supported by substantial evidence on the record as a whole. The Court so finds for the following reasons.

I. <u>Supportability</u>. Davidson opined that Gates' pain prevents her from performing work-related activities. The ALJ found, though, that Davidson's treatment notes reflect "routine and conservative treatment for pain that is generally noted to be effective." <u>See</u> Transcript at 26. The finding has support in the record, and the ALJ could properly find that Davidson's opinions are not supported by his own notes. Although Gates has a painful range of motion in her neck, back, and left shoulder, she reported good relief with narcotics and muscle relaxers, and a back brace helps control her pain during activity.[5] It is also worth noting that at an April 17, 2019, presentation for a cough, Gates had a normal gait and "grossly normal tone and muscle strength." <u>See</u> Transcript at 637. Although Davidson admonished Gates to avoid "heavy lifting," <u>see</u> Transcript at 518, Davidson otherwise made little mention in his notes of any work-related limitations.

---

[5] <u>See</u> <u>e.g.</u>, Transcript at 528, 525, 523, 520, 511, 508, 499, 491, 488, 485, 479, 475, 472, 469, 463, 459, 455, 586, 574-575, 570, 615, 612, 607, 642, 639, 633, 630, 626.

Davidson also opined that Gates' impairments give rise to manipulative limitations and render her completely unable to reach, finger, or handle. The ALJ found that Gates has manipulative limitations but only to the extent she is unable to engage in frequent overhead reaching. The ALJ declined to craft a residual functional capacity that included a limitation with respect to fingering or handling, noting that additional manipulative limitations are not supported by Davidson's treatment notes. The ALJ's finding has support in the record, and the ALJ could properly find that Davidson's opinions are not supported by his own notes. Although Gates has reported reduced grip strength in both hands, see Transcript at 626, there is little to suggest her reduced grip strength renders her completely unable to finger or handle. Davidson's notes certainly do not support such extreme limitations.

Davidson also opined that Gates' impairments require frequent bathroom breaks, frequent rest periods, and longer than normal breaks. The ALJ, though, declined to craft a residual functional capacity that included a limitation for such breaks, noting that the limitation is "not consistent with the lack of follow-up treatment for [Gates'] genitourinary impairments." See Transcript at 26. The ALJ's finding has support in the record, and the ALJ could properly find that Davidson's opinions are not

supported by his own treatment notes. Although Gates has had repeated surgeries on her vaginal area and reported incontinence, her symptoms requiring frequent breaks are largely intermittent. Many of Davidson's notes make no mention of Gates' genitourinary issues or otherwise reflect that the issues are controlled. Davidson's notes certainly do not support such an extreme limitation.

Gates faults the ALJ for failing to give good reasons for discounting Davidson's medical opinions from before the alleged onset date. The Court cannot agree. The ALJ noted the opinions but discounted them, in part, because they were not supported by Davidson's own treatment notes. The ALJ's reason for discounting the opinions is an acceptable reason, see Adair v. Saul, 816 Fed.Appx. 26 (8th Cir. 2020) (opinion may be discounted if inconsistent with physician's notes), and the reason is supported by the record. Specifically the ALJ could and did reasonably find that Davidson's opinions in his January 21, 2016, and April 18, 2016, To Whom It May Concern letters are inconsistent with his own treatment notes.[6]

---

[6] In Gates' prior application, an ALJ discounted the medical opinions offered by Davidson in his January 2, 2016, To Whom It May Concern letter because, as of that date, he had only provided conservative treatment, his opinions were inconsistent with his own treatment notes, and his opinions were inconsistent with Gates' activities of daily living. United States Magistrate Judge Joe Volpe found that the ALJ could find as he did. See Gates v. Berryhill, 2017 WL 1416859. Although Judge Volpe's views are not binding in this case, they are at least worth noting.

Gates also faults the ALJ for failing to give good reasons for discounting Davidson's medical opinions from after the alleged onset date. Again, the Court cannot agree. The ALJ noted the opinions but discounted them, in part, because they were not supported by Davidson's own treatment notes. The ALJ's reason for discounting the opinions is supported by the record, and the ALJ could find that Davidson's opinions in his May 23, 2018, Medical Source Statement are inconsistent with his own treatment notes. The notes reflect that while Gates has tenderness in her neck, a painful range of motion in her neck, back, and left shoulder, and reduced grip strength, her symptoms typically respond to medication.

II. <u>Consistency</u>. The ALJ's consideration of the consistency of Davidson's medical opinions was minimal, likely due to the fact that Davidson's treatment notes comprise the lion's share of the evidence in this case. The ALJ's minimal consideration of the consistency of Davidson's opinions was nevertheless sufficient and indicates that Davidson's opinions are inconsistent with other evidence in the record.

For instance, the ALJ noted that Jarrard and Cathey believed Gates is capable of performing light exertional work. The ALJ could and did credit their opinions as he could reasonably find that the opinions were consistent with the record as a whole.

The ALJ noted the lack of "diagnostic imaging showing objective evidence of any medically determinable impairment." See Transcript at 19. Although a MRI revealed a C6-C7 disc herniation impinging the C7 nerve root and a bulging disc at C5-C6, and Gates later underwent surgery, the testing and surgery occurred before the alleged onset date.

The ALJ also noted Gates' daily activities. He found that she is capable of "some basic activities of daily living in spite of her impairments." See Transcript at 25. He found, and the record supports the finding, that she goes grocery shopping, prepares simple meals, "cleans house a little bit at a time over the course of a day," drives for short trips, and denies problems with her personal care. See Transcript at 25.

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the ALJ's decision if that decision is supported by good reason and is based on substantial evidence. See Dillon v. Colvin, 210 F.Supp.3d 1198 (D.S.D. 2016). In fact, the Court may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite decision. See Id. Here, the evidence is capable of more than one acceptable characterization, and the ALJ could find as he did with respect to Davidson's medical opinions.

Gates offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Gates maintains that the ALJ failed to resolve an apparent conflict between the VE's testimony and the DOT.

A disability claim is evaluated using a five step sequential evaluation process, the last step of which requires the ALJ to show, inter alia, that the claimant can perform other types of work. See Crawford v. Colvin, 809 F.3d 404 (8th Cir. 2015). In making the showing, the ALJ may rely upon a VE's testimony in response to "a properly formulated hypothetical question," see Gann v. Berryhill, 864 F.3d 947, 952 (8th Cir. 2017), but the testimony must "generally be consistent with the DOT." See Peters v. Berryhill, 4:16-cv-01342-PLC, 2018 WL 1858159, 2 (E.D.Mo. 2018). If there is an "apparent unresolved conflict" between the VE's testimony and the DOT, the ALJ must elicit "a reasonable explanation for the conflict" and resolve the conflict by determining if the explanation provides a basis for relying on the VE's testimony rather than the DOT. See Moore v. Colvin, 769 F.3d 987, 989 (8th Cir. 2014). Absent adequate rebuttal, VE testimony that conflicts with the DOT does not constitute substantial evidence upon which the ALJ may rely in meeting his burden of proving the existence of other jobs the individual can perform. See Id. at 990.

Here, the VE testified that a hypothetical individual who cannot engage in frequent overhead reaching would be able to work as a police aide or as an administrative clerk, jobs that require frequent reaching. The Court finds that an apparent conflict exists between the testimony and the DOT. The question is whether the ALJ resolved the conflict by relying upon the VE's statement that his testimony was based on his "past experience and training, and having experience with these and similar jobs."

The question requires the Court to re-enter the "reaching" morass that has resulted in confusing decisions.[7] The Court will not attempt to reconcile the decisions but notes that the more specific the testimony, the more favorably it is viewed. For instance, in Rollins v. Kijakazi, No. 3:20-cv-00239-PSH, 2021 WL 3891060, 2 (E.D.Ark. 2019), a VE's statement that his testimony was based on his "professional training and years of experience in the field" was not adequate to resolve the conflict. In Jones-Brinkley v. Commissioner of Social Security Administration, No. 3:20-cv-00058-JTK, 2021 WL 371689, 2 (E.D.Ark. 2021), though, a VE's statement that his testimony was based on his "experience and judgment about the job requirements" was adequate to resolve the conflict.

---

7    See Bass v. Saul, No. 3:20-cv-00167-BD, 2021 WL 1813181, 3 (E.D.Ark. 2021) ("There are a number of cases involving reaching conflicts in this Circuit, and the decisions are not all aligned.")

Had the VE in this instance based his testimony simply on his "past experience and training," the Court would have followed Rollins v. Kijakazi, found the statement inadequate to resolve the conflict, and ordered a remand. The VE, though, based his testimony on something more, specifically, his "experience with these and similar jobs." The statement, though certainly not a model of specificity nor thoroughness, demonstrates that he is familiar with the demands of the jobs the hypothetical individual can perform. The ALJ could therefore rely upon the VE's testimony at step five.[8]

The Court finds, in conclusion, that there is substantial evidence on the record as a whole to support the ALJ's findings, and he did not commit legal error. Gates' complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 15th day of December, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

---

[8] The Court recognizes that the "reaching" decisions hinge, to some degree, on how sentences are parsed, which is unfortunate. This problem could be rectified by the ALJ and the claimant's attorney asking additional questions of the VE. Here, neither the ALJ nor Gates' attorney asked the VE a follow-up question.